IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MAY - 6 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

JOAN PAULING,                    )
                                 )
          Plaintiff,             )
                                 )
     v.                          )    1:10cv1196 (LMB/JFA)
                                 )
ROBERT GATES,                    )
     Secretary of Defense,       )
                                 )
          Defendant.             )

## MEMORANDUM OPINION

Before the Court is Defendant's Motion for Summary Judgment
[Dkt. No. 13]. For the reasons stated in open court and in this
Memorandum Opinion, defendant's motion will be granted and judgment
will be entered in favor of the defendant.

## I. Background

This disability discrimination civil action arises from
plaintiff Joan Pauling's ("Pauling") employment with the Department
of Defense. On May 26, 2009, the Defense Information Systems
Agency ("DISA") hired Pauling to be an Information Technology
Specialist with its Global Combat Support System ("GCSS") Project
Management Office, which tests the military's computer networks.
Compl. ¶ 9; Def.'s Statement of Undisputed Facts ¶ 1. Pauling was
responsible for generating and executing testing protocols and
drafting reports on the test results. Id. ¶ 4. Pauling was
subject to a one-year probationary period, in which the agency had
wide latitude to terminate her if it determined that she was unfit
for the position. Id. ¶ 3; 5 C.F.R. § 315.801(a).

In July 2009, Pauling informed her team leader, Charlitta Ayala ("Ayala"), and her first-line supervisor, David Calvin ("Calvin"), that she had survived cancer from 2000 to 2005. Compl. ¶ 11; Def.'s Statement of Undisputed Facts ¶¶ 5-6; Def. Ex. 1. In June or July 2009, Pauling began experiencing heart palpitations and hypertension, and she frequently visited DISA's nurse to have her blood pressure monitored and to check her heart rate. Pl.'s Statement of Material Facts (sic) in Dispute ¶¶ 4-5.[1]

On October 27, 2009, Calvin issued Pauling's nine-page Performance Appraisal ("Appraisal"), in which he wrote that Pauling's failure to learn the GCSS system "put a greater load of work on the rest of the test team[.]" Def.'s Statement of Undisputed Facts ¶ 9; Def. Ex. 3. Of the eight mandatory "critical" and "job-specific" functions of her position, none was rated fully successful. Def.'s Statement of Undisputed Facts ¶ 8. Overall, Pauling received a rating of 1.6 on a 5-point scale, between "unacceptable" and "minimally successful." On the same day that Calvin issued the Appraisal, Pauling fainted and did not return to work for six days. Id. ¶ 16.

On November 2, 2009, Pauling returned to work and visited the DISA nurse, who told Pauling to seek medical attention for her high

_____

[1]Plaintiff appears to have miscaptioned this pleading. Under Local Civ. Rule 56(B), the parties are directed to list those facts they believe are not in dispute.

2

blood pressure and heart rate. Pl.'s Statement of Material Facts in Dispute ¶ 8. As Pauling was en route to inform Calvin of her medical condition, Calvin presented her with a seven-page Memorandum of Performance Concerns. ("Performance Memorandum"). Def's Statement of Undisputed Facts ¶ 7. The Performance Memorandum provided a roadmap for improvement and contains specific examples of Pauling's deficient performance. Id. ¶ 7; Def. Ex. 4. For example, Calvin wrote that Pauling only completed 11 of the 54 test cases that were assigned to her. Def.'s Statement of Undisputed Facts ¶ 11.

After Calvin issued the Performance Memorandum, Pauling left work for the remainder of the day and worked intermittently for the next week. The agency granted her leave, some of which was unpaid because Pauling had depleted all of her earned leave. Id. ¶ 17. During the first week of November, Pauling requested to participate in the Voluntary Leave Transfer Program ("VLTP"), a government program that allows employees to donate their paid leave to a sick co-worker. Compl. ¶¶ 21-23. Calvin told her that probationary employees were ineligible for the VLTP. Id. ¶ 22. Later that month, however, Calvin told Pauling that she was eligible for the program, and in December he approved her application, retroactive to the beginning of her medical emergency. Def.'s Statement of Undisputed Facts ¶¶ 37-39.

On November 10, 2009, Calvin issued Pauling a Memorandum for

3

Unprofessional Behavior, arising from Pauling rolling her eyes at Ayala in a "rude and disrespectful" manner during the previous week.  Id. ¶ 18.  Also on November 10, Pauling told Calvin that she planned to take sick leave immediately for at least the next few weeks.  Calvin requested that Pauling's physician complete a WH-380, the government's required paperwork for long-term sick leave. Id. ¶ 23.  Pauling left work that day, and did not report to work again until December 29, 2009.  Id. ¶ 20.

On November 12, 2009, Pauling submitted a WH-380, completed by a nurse, stating only that Pauling suffered from a "rapid heart rate" and "high blood pressure" and that her time off from work would be "indefinite."  Id. ¶ 24; Def. Ex. 25.  Calvin told Pauling that the form was unacceptable because it lacked the requisite diagnosis, prognosis, and expected recovery time.  Def.'s Statement of Undisputed Facts ¶ 24.  On November 13, 2009, Pauling submitted a second WH-380, completed by her primary care physician.  The physician wrote that Pauling could "not work currently due to [her] symptoms," but she also wrote that Pauling was "able to perform . . . her job functions."  Id. ¶ 25; Def. Ex. 27.  Because of the contradictory statements, Calvin rejected this documentation as inadequate.  On November 17, 2009, Pauling sent Calvin a third WH-380, which he approved, granting Pauling leave without pay retroactive to November 11, 2009.  Def.'s Statement of Undisputed Facts ¶ 27.

On November 18, 2009, Pauling contacted DISA's Equal Employment Opportunity ("EEO") Office and initiated a discrimination complaint. Pl.'s Statement of Material Facts in Dispute ¶ 22; Def.'s Statement of Undisputed Facts ¶¶ 59-60. Pauling alleged that her supervisors issued the Appraisal, Performance Memorandum, and Unprofessional Conduct Memorandum because of her disabilities, which she reported as being a cancer survivor and having an unstable heart rate, high hormone levels, and high blood pressure. Def. Ex. 43.

On November 19, 2009, Pauling asked Calvin to allow her to telecommute. Id. ¶ 31. DISA policy states that telecommuting "is not a right" and is subject to "the discretion of the supervisor." Id.; Def. Ex. 10. Calvin denied the telecommuting request because of Pauling's poor performance. Def.'s Statement of Undisputed Facts ¶ 33. Moreover, DISA determined that Pauling's position was not suitable for telework because most of her job involved using a classified network. Def.'s Statement of Undisputed Facts ¶ 35; Compl. ¶ 17.

After Pauling returned to work on December 29, 2009, her performance problems continued. On January 13, 2010, Calvin issued an Amended Memorandum of Performance Concerns, providing Pauling with detailed performance goals. Def.'s Statement of Undisputed Facts ¶ 41; Def. Ex. 7. Calvin required Pauling to lead the test activities on a project known as "NIPRNet" and directed her to

5

complete the assigned test cases. Although weekly reporting was required of the entire test team, Calvin required daily reporting for Pauling, "to validate that [Pauling understood] the seriousness of ensuring that any defects/deficiencies are brought to PMO's attention immediately, so as not to impact the warfighter." Def.'s Statement of Undisputed Facts ¶ 42. Calvin wrote that he remained "deeply concerned" about Pauling's performance and that as a probationary employee, she could be terminated if her performance did not improve immediately. Id. ¶ 46.

Over the next two months, Pauling failed to complete many of the requirements outlined in the amended memorandum on time. Pauling completed none of the six specific "critical tasks" for the NIPRNet project on schedule, delaying the entire branch's progress on the program. Id. ¶¶ 50-51. Additionally, Pauling failed to communicate with team members and did not attend important meetings after she returned to work. Id. ¶ 52. Pauling also failed to complete test cases, requiring her team members to complete her work. Id.

Citing these continued performance problems, DISA terminated Pauling's employment on March 4, 2010, about nine months into her one-year probationary period. Compl. ¶ 27, Def.'s Statement of Undisputed Facts ¶ 47. The five-page termination letter described specific examples of uncompleted tasks and concluded that Pauling's work performance "fails to demonstrate (her) fitness or

qualifications for continued employment." Def. Ex. 8.

On July 27, 2010, DISA's EEO Office released the results of its investigation. The investigation created a record of more than 800 pages of affidavits, e-mails and other documents, but did not reach a legal conclusion about the alleged discrimination.

On October 21, 2010, Pauling filed this civil action under the Rehabilitation Act, 29 U.S.C. §§ 790 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. The complaint states three theories of liability: failure to accommodate Pauling's disability and disparate treatment based on Pauling's disability (Count I), and retaliating against Pauling for filing a discrimination complaint with the EEO Office (Count III).[2] Pauling seeks compensatory damages of more than $300,000, reinstatement, attorney's fees, and costs.

## II. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The Court must view the record in the light

---

[2]Count II stated a claim for creation of a hostile work environment, but plaintiff voluntarily dismissed that count.

7

most favorable to the nonmoving party, and must draw all inferences in favor of that party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). However, "the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008). Accordingly, to survive a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995).

## III. Discussion

Claims of disability-based discrimination and retaliation brought under the Rehabilitation Act can be established either by direct or indirect proof. In cases such as this, where the allegations rest solely on indirect proof, courts apply the three-part "burden-shifting" framework created in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see, e.g., Hooven-Lewis v. Caldera, 249 F.3d 259 (4th Cir. 2001) (applying McDonnell Douglas framework to Rehabilitation Act discrimination claim).

First, the plaintiff has the burden of establishing a *prima facie* case of discrimination. The elements of the *prima facie* case

8

vary depending on the type of discrimination being asserted. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate legitimate non-discriminatory reasons for the adverse employment decision. Hux v. City of Newport News. Va., 451 F.3d 311, 314-15 (4th Cir. 2006). Because this is a burden of production, not of proof or persuasion, the reasons proffered need not ultimately persuade the court, so long as the defendant offers a legitimate nondiscriminatory rationale for its decision. Id. at 314. Lastly, to overcome the defendant's legitimate non-discriminatory reasons, the plaintiff must prove by a preponderance of the evidence that the proffered justifications were not the real reasons for the adverse decision, but in fact were a pretext for discrimination or retaliation. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Pauling's claims fail under the McDonnell Douglas framework because Pauling has not established a *prima facie* case for all but two of her claims. As to those claims for which she has established a *prima facie* case, as well as all her other claims, the government has presented evidence of legitimate nondiscriminatory, non-retaliatory reasons for all the adverse employment actions, and Pauling has failed to rebut the government's explanations with evidence of pretext.

A.   Failure to accommodate (Count I)

9

Pauling claims that DISA failed to accommodate her disability when it denied her request to telecommute.  Compl. at ¶ 34.[3]  To establish a *prima facie* case for a failure to accommodate, a plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute;[4] (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quotations omitted).

The government correctly argues that Pauling has failed to demonstrate that she could perform the essential functions of her position if she had been permitted to telecommute.  Mot. for Summary Judgment at 20.  The record is replete with evidence that Pauling was not performing adequately throughout her tenure at

---

[3]In her Opposition brief, Pauling appears to argue, for the first time, that DISA also failed to accommodate her disability when it delayed the approval of her Voluntary Leave Transfer Program application.  Opp. at 15-17.  The government correctly points out that Pauling's complaint raises this delay only in Count III, which alleges retaliation. Moreover, Pauling, who has been represented by counsel throughout the administrative proceedings and this litigation, did not raise this claim in her EEO complaint.  Exhaustion of administrative remedies is mandatory for employment discrimination claims.  Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005).  Therefore, the delay will be considered only under the retaliation claim in Count III.

[4]The parties do not dispute that Pauling has a disability within the meaning of the statute.  Therefore, that element is not at issue in any of the claims in this civil action.

10

DISA. See Def.'s Statement of Undisputed Facts ¶¶ 7-14. Pauling's Opposition brief fails to rebut the government's abundant evidence that she was unable to perform her job. Instead, Pauling devotes four pages to attacking the Performance Evaluation as "subjective" and "contradictory." Opp. at 11. This argument ignores the abundant specific examples of poor performance that are described in the Appraisal and Performance Memorandum. Pauling provides absolutely no evidence whatsoever that she performed satisfactorily. Pauling argues that DISA approved a similar telecommuting request for Victoria Akpan ("Akpan"), another Information Technology Specialist; however Pauling has provided no evidence of Akpan receiving similarly low performance evaluations. Because Pauling has not produced any evidence that she could perform her job with a reasonable accommodation, Pauling has failed to establish a *prima facie* case for failure to accommodate.

Even if Pauling had made out a *prima facie* case, the government has stated two legitimate nondiscriminatory reasons for the denial of telecommuting. First, the government argues that it denied Pauling's telecommuting request mainly because of her poor performance. Def.'s Statement of Disputed Facts ¶ 33. A December 7, 2009 email from Dawn Davis, DISA's EEO disability officer, to Calvin confirms that Pauling's poor performance was the sole reason that DISA denied the telecommuting request. Def. Ex. 29. It is entirely reasonable for an employer to require that an

underperforming employee work in the office rather than at home. In addition, it is undisputed that part of Pauling's job involved handling classified information. DISA does not allow employees to telecommute if they regularly access classified information; this policy applies to all employees and has absolutely nothing to do with Pauling's disability. Pauling responds that she worked on one unclassified project, but she has not addressed the government's evidence that much of her work involved classified projects. Both of the government's explanations establish a legitimate nondiscriminatory basis for the denial of her request to telecommute, and Pauling has not presented any evidence to suggest that these were pretext for discrimination. Therefore, summary judgment is appropriate for this claim.

B. Disparate treatment (Count I)

Pauling next argues that several of her supervisors' actions and omissions constituted disparate treatment. Among the actions Pauling challenges are the defendant's: 1) denial of training; 2) initially denying leave and requiring Pauling to come to work; 3) issuance of the Unprofessional Conduct Memorandum; 4) requiring daily and weekly reports; and 5) issuing the Appraisal and the Performance Memorandum.

To make out a *prima facie* case for a disparate treatment claim under the Rehabilitation Act, the plaintiff must establish that she "(1) is an individual with a disability within the meaning of [the

12

Americans with Disabilities Act]; (2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of the disability." Edmonson v. Potter, 118 Fed. Appx. 726, 728 (4th Cir. 2004).

## 1. Denial of training

Pauling claims that when she requested formal training in June or July 2009, a supervisor told her that it would have been a "waste of money," despite the fact that most other team members received the training. Def. Ex. 10 at 48. Pauling claims that such disparate treatment violates the Rehabilitation Act. Compl. ¶ 35.

The government argues that Pauling has failed to state a *prima facie* case for discrimination because she has not alleged an adverse employment action. Mot. for Summary Judgment at 25. In a July 17, 2009 email, Ayala encouraged Pauling to receive training, which cost between $1,500 and $3,500 per attendee. Def. Ex. 18. Shortly after Ayala's email, DISA decided to forego this training for all of the branch's employees because identical training was available for free through the agency's developer. Def.'s Statement of Undisputed Facts at ¶ 58. Pauling and her co-workers attended the training in September 2009. Id. Pauling's Opposition brief does not address the government's evidence that Pauling and her co-workers received this training. Because Pauling has not demonstrated that she was treated differently from any other employee as to training opportunities, she has failed to

13

demonstrate that she suffered an adverse employment action. Therefore, she has not established a *prima facie* case for disparate treatment based on a denial of training opportunities.

Moreover, even if Pauling had satisfied the requirements for a *prima facie* case of disparate treatment, the government has presented a legitimate nondiscriminatory reason for its action. The government saved thousands of dollars by providing the training through its developer rather than an outside vendor. The evidence demonstrates that this decision is a legitimate nondiscriminatory explanation because it applied to all branch employees, not just to Pauling. Pauling has failed to rebut this explanation with evidence that it was a pretext for discrimination, and therefore summary judgment will be granted to the defendant as to this claim.

2.   Claims related to medical documentation

Pauling claims that DISA discriminated against her by denying her first two leave requests, requiring her to check in at work until her leave request was approved, and contacting her physician with questions about information they had provided on her sick leave applications. Compl. ¶¶ 18, 36, 40, and 41.

The government correctly argues that none of these actions constitute an adverse employment action. Mot. for Summary Judgment at 27. Even if the initial denials were improper, Calvin approved Pauling's third leave request on November 17, 2009, five days after she submitted her first leave request, and the approval was

retroactive to November 11, 2009. As the government correctly

argues, Pauling was not harmed by a mere five-day delay. Indeed, a

short delay in approval of a leave request does not constitute an

adverse employment action. See Abad-Santos v. Clark County, 233

Fed. Appx. 625, 627 (9th Cir. 2007) (Initial denial of leave "did

not constitute an adverse employment action because [the leave was]

ultimately approved"). Because Pauling has not rebutted the

government's evidence and argument that she was not harmed, she has

failed to establish that she suffered an adverse employment action

in respect to the handling of requests for medical leave, and

therefore, has failed to make out a *prima facie* case for disparate

treatment.

Even if Pauling had stated a *prima facie* case for disparate

treatment, the government has presented a legitimate

nondiscriminatory reason for denying her first two leave

applications. Under federal regulations, sick leave requests must

contain a diagnosis, prognosis, and "[a]n explanation of the impact

of the medical condition on overall health and activities,

including the basis for any conclusion that restrictions or

accommodations are or are not warranted, and where they are

warranted. . ." 5 C.F.R. § 339.104. Calvin correctly denied the

November 12, 2009 WH-380 because the nurse who filled it out did

not specify a diagnosis, prognosis, or time period for absence, and

the November 13, 2009 WH-380 because it was self-contradictory,

stating both that Pauling could not work and that she was able to perform her job functions. Pauling's insufficient documentation was the sole reason for the five-day delay in approval. Pauling has failed to rebut the government's legitimate nondiscriminatory reason with evidence of a discriminatory pretext; therefore summary judgment on this issue is appropriate.

### 3. Memorandum for Unprofessional Conduct

Pauling claims that Calvin issued an "unwarranted" Memorandum for Unprofessional Conduct on November 10, 2009. Compl. ¶ 38. The memorandum, which was issued after Pauling allegedly rolled her eyes at Ayala, states that such behavior "will not be tolerated." Def. Ex. 5. Pauling characterizes the allegation as "unsupported," and states that she "was never given a prior warning concerning performance issues." Compl. ¶ 32.

The government correctly argues that Pauling fails to allege that the Memorandum for Unprofessional Conduct caused her any damage, and therefore Pauling has not alleged an adverse employment action. Mot. for Summary Judgment at 29. Pauling was not disciplined for rolling her eyes. In her Opposition brief, Pauling does not produce any evidence of damage caused by the memorandum. Instead, she argues that Calvin "threatened to terminate her" over the incident. Opp. at 13. That claim, however, is entirely unsupported, and is contradicted by the statement in the Memorandum that it was a mere "reminder" to behave professionally. Because

16

Pauling has not alleged an adverse employment action, she has not made out a *prima facie* case for discrimination.

Even if Pauling had alleged a *prima facie* case for discrimination, the government has a legitimate nondiscriminatory need to prevent rude workplace behavior. It is not unreasonable for an employer to warn an employee to avoid a display of disrespect to a co-worker. Pauling has not provided any evidence that the Memorandum was a pretext for discrimination; accordingly, summary judgment is appropriate as to this claim.

### 4. Requirement to provide daily work reports

Pauling next claims that DISA discriminated against her when it required her "to provide daily and weekly reports of her accomplishments while non-disabled employees of her team were not required to provide daily and weekly reports." Compl. ¶ 40. The government argues that the reporting requirement was not an adverse employment action, and that weekly reporting was required of the entire test team. Def.'s Statement of Undisputed Facts ¶ 42; Def. Ex. 16. Plaintiff's Opposition brief does not dispute this assertion. The government imposed the additional daily reporting requirement on Pauling because of her well-documented poor performance. The government correctly argues that the reporting requirement did not harm Pauling and she therefore cannot demonstrate that it was an adverse employment action. Pauling's Opposition brief does not address the government's argument that

she was not harmed.  Therefore, Pauling has failed to state a *prima facie* case of disparate treatment.

Moreover, DISA reasonably required the reports to ensure the security of the Defense Department's information technology systems.  The government's need to ensure accurate work is clearly a legitimate nondiscriminatory reason for requiring regular reports.  Pauling has failed to rebut the government's explanation with evidence of a discriminatory pretext, and therefore summary judgment is appropriate for this claim.

### 5.   Appraisal and Performance Memorandum

Pauling next argues that she suffered discrimination when DISA issued the October 27, 2009 Appraisal and November 2, 2009 Performance Memorandum.  Compl. at ¶ 37.  The government acknowledges that Pauling has stated a *prima facie* case for discrimination because these negative performance evaluations led to her termination.  Mot. for Summary Judgment at 31.

The government argues, however, that Pauling's poor performance provides a legitimate nondiscriminatory reason for these evaluations.  Id.  As described above, the government has a plethora of contemporaneous documentation of Pauling's lackluster performance.  See Def.'s Statement of Undisputed Facts ¶¶ 7-14; Def. Exs. 4-19.[5]  These documents contain numerous objective rating

_____

[5]Pauling argues that the government has not put forth any evidence that "she received either verbal or written counseling from management within the May through September appraisal

18

categories that DISA used in assessing all employees. DISA has a strong interest in accurately documenting an employee's performance, particularly during a probationary period.

Pauling repeatedly attacks the Appraisal and Performance Memorandum as subjective, and argues that DISA "has not shown a scintilla of evidence that prior to issuance of the Performance Evaluation on October 27, 2009, Plaintiff's work performance was deficient[.]" Opp. at 11. This inaccurate characterization ignores the government's overwhelming evidence of poor performance. For example, the Performance Memorandum describes an assignment that required Pauling to produce the final draft of a "Mercury Transition Plan" by June 29, 2009. More than a month after the deadline, on July 30, 2009, Pauling provided the first draft, which "lacked the executable details required for a transition plan, contained grammatical and spelling errors, had incomplete tables and had not been coordinated with the test team or our external partners." Ex. 4 at 14-15. Pauling has presented absolutely no evidence of adequate performance, other than an affidavit signed by Pauling. The subjective beliefs of a plaintiff, without more, are insufficient to create a genuine issue of material fact regarding

period." Opp. at 11. This argument is irrelevant because DISA provided detailed information about her performance problems in the October Appraisal and November Performance Memorandum. Pauling's job was not terminated until the following March, more than four months after she first received notice of her performance problems and suggestions for improvement.

discriminatory intent. Bryant v. Bell Atl. Md., Inc., 288 F.3d
124, 134-135 (4th Cir. 2002). Because Pauling has failed to rebut
the government's legitimate nondiscriminatory explanation for the
Appraisal and Performance Memorandum, she has not stated a valid
claim for disparate treatment. Therefore, summary judgment has
been granted to the government on this claim.

## C. Retaliation (Count III)

In Count III, Pauling argues that she engaged in protected
activity when she filed a complaint with DISA's EEO Office on
November 18, 2009, and that DISA retaliated by delaying her VLTP
application in early November 2009 and terminating her in March
2010.[6]  To establish a *prima facie* case of retaliation, a plaintiff
must show that "(1) he engaged in a protected activity; (2) the
employer took adverse action against him; and (3) a causal
connection existed between the protected activity and the adverse
action." Burgoon v. Potter, 369 F. Supp. 2d 789, 797 (E.D. Va.
2005).

### 1.   Delay of the VLTP application

Pauling claims that Calvin retaliated against her by initially
denying her VLTP request, which she made during "the first week" of
November 2009. Compl. ¶ 55. It is undisputed that Pauling filed

_____

[6]Pauling's complaint also alleged that DISA retaliated
against her by denying her telecommuting request and denying her
training, but she withdrew those claims in her Opposition brief.
Opp. at 17, n.2.

her EEO complaint on November 18, 2009, approximately two weeks after her initial VLTP request was denied. Given the chronology of events, that initial denial could not have been retaliation for the plaintiff's filing an EEO complaint.

Pauling argues, without any evidentiary support, that after the initial denial "she continued to pursue the leave, without any meaningful assistance from Defendant, until she was finally approved on December 28, 2009." Opp. at 18. Pauling does not address the government's argument that the initial denial occurred before she filed her EEO complaint. Moreover, she concedes, as she must, that her request was, in fact, finally approved on December 28, 2009. Therefore, she did not even suffer an adverse employment action as her request was ultimately approved. Pauling has failed to establish a causal connection between her protected activity and any alleged adverse employment action, and has not even established any adverse employment action; accordingly, summary judgment will be granted on this claim.

## 2. Termination

Lastly, Pauling alleges that her termination was retaliatory. Compl. ¶¶ 57-58. The government concedes that Pauling has stated a *prima facie* case for retaliation because termination is an adverse employment action, and the termination occurred after the protected activity. Mot. for Summary Judgment at 37. However, the government has clearly established that it had a legitimate

21

nonretaliatory reason for terminating her employment. As discussed above, the government has abundant evidence of Pauling's inability to complete her tasks. Moreover, DISA terminated Pauling while she was a probationary employee, a status which gave the agency wide latitude to determine whether to terminate her. See George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) (holding that "probationary employees and permanent employees are not similarly situated . . . [and] under federal regulations, probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee.").

Pauling focuses most of her argument on one of the government's many reasons for her termination: her failure to complete the NIPRNet projects in February 2010. Pauling argues that she failed to complete the tasks because federal government offices in the Washington, D.C. area were closed for four days due to a snowstorm. Opp. at 19. The government defeats that argument by showing that Pauling did not complete any work whatsoever between January 27, 2010 and February 18, 2010. Mot. for Summary Judgment at 18. More importantly, many of the government's reasons for her termination were documented in the October 27, 2009 Appraisal and November 2, 2009 Performance Memorandum, which were issued before Pauling filed her EEO complaint on November 18, 2009. The evidence establishes that the government had sufficient cause to terminate Pauling before she ever filed her EEO complaint.

Pauling has not provided a single piece of evidence suggesting that the government's explanation is a pretext for retaliation.[7] Accordingly, summary judgment will be granted to the government as to this retaliation claim.

## IV. Conclusion

For the reasons discussed above, defendant's Motion for Summary Judgment [Dkt. No. 13] will be GRANTED by an Order to be issued with this Memorandum Opinion.

Entered this 6th day of May, 2011.

Alexandria, Virginia

/s/ _____

**Leonie M. Brinkema**
**United States District** Judge

---

[7]During oral argument, plaintiff requested an opportunity to take discovery. That request was denied. Plaintiff was represented by counsel throughout the administrative investigation of her case, which produced an extensive administrative record exceeding 800 pages, including affidavits, emails and other documents. Plaintiff certainly had sufficient opportunity to develop her evidence during that process.